UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

**SEALED**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | Magistrate Case No. '08 MJ 2665 |
| Plaintiff, | |
| v. | COMPLAINT FOR VIOLATIONS OF: |
| **JUAN HURTADO TAPIA,** aka Corrupto, | Title 18, U.S.C., Sect. 1521(c)(2), Obstructing, Influencing or Impeding an Official Proceeding; |
| Defendant. | Title 18, U.S.C. Sect. 1030(a)(2), Fraud and Related Activity in Connection with Computers; |
| | Title 21, U.S.C. Sect. 1001, False Statement |

The undersigned complainant, being duly sworn, states:

Count 1

On or about July 9, 2008, in the Southern District of California, the defendant, JUAN HURTADO TAPIA, aka Corrupto, corruptly attempted to obstruct, influence, and impede an official proceeding, that is, an investigation being conducted by the United States Drug Enforcement Administration, by intentionally providing to Drug Enforcement Administration Special Agent Neves false and misleading information about the reasons why he (TAPIA) ran a federal law enforcement database search, in violation of Title 18, United States Code, Section 1512(c)(2).

Count 2

On or about May 9, 2008, within the Southern District of California, defendant JUAN HURTADO TAPIA, aka Corrupto, knowingly accessed a computer in a manner that exceeded authorized access and by means of such conduct obtained information from an department or agency of the United States: to wit, the United States Department of Justice, in furtherance of the commission of a violation of Title 21, United States Code Sections 841(a)(1), 846, conspiracy to distribute controlled substances, all in violation of Title 18, United States Code, Section 1030(a)(2)(C) and (c)(2)(B)(ii).

Count 3

On or about July 9, 2008, within the Southern District of California, defendant JUAN HURTADO TAPIA, aka Corrupto, in a matter within the jurisdiction of the United States Department of Justice, a department of the United States, did knowingly and willfully make false, fictitious and fraudulent statements and representations as to material facts in that he did represent and state to Drug Enforcement Administration Special Agent Neves that he had run a law enforcement criminal history check on a man named Adrian Rocha as part of a automobile theft investigation, whereas in truth and fact, as defendant then and there well knew that statement and representation was false, fictitious and fraudulent when made; in violation of Title 18, United States Code, Section 1001.

Count 4

On or about July 11, 2008, within the Southern District of California, defendant JUAN HURTADO TAPIA, aka Corrupto, in a matter within the jurisdiction of the United States Department of Justice, a department of the United States, did knowingly and willfully make false, fictitious and fraudulent statements

and representations as to material facts in that he did represent and state to Federal Bureau of Investigation Special Agent Klawiter, Federal Bureau of Investigation Special Agent Lambert, and Drug Enforcement Administration Special Agent Sparks that he had run a law enforcement criminal history check on a man named Adrian Rocha as part of a automobile theft investigation, that he had not run it on behalf of either William Amezcua-Flores or Alexander Mayorquin, and that he had never passed information about a pending law enforcement investigation to William Amezcua-Flores, whereas in truth and fact, as defendant then and there well knew that statement and representation was false, fictitious and fraudulent when made; in violation of Title 18, United States Code, Section 1001.

And the complainant further states that this complaint is based on the attached statement of facts, which is incorporated herein by reference.

*Natalie Lambert*
SIGNATURE OF COMPLAINANT
Natalie Lambert
Special Agent
Federal Bureau of Investigation

SWORN TO BEFORE ME AND SUBSCRIBED IN MY PRESENCE, THIS 28th DAY OF AUGUST 2008.

*William McCurine Jr.*
WILLIAM McCURINE, JR.
UNITED STATES MAGISTRATE JUDGE

CONTINUATION OF COMPLAINT:
JUAN HURTADO TAPIA

## PROBABLE CAUSE STATEMENT

I declare under penalty of perjury that the following statement is true and correct:

1. I am a duly appointed Special Agent of the FBI having been employed as such since May 15, 2005. I am authorized to investigate violations of federal laws.

2. Since February 2008, I have been involved in a multi-agency investigation being conducted by Special Agents of the Federal Bureau of Investigation (FBI), Drug Enforcement Administration (DEA), and San Diego Police Department (SDPD), investigating the drug trafficking activities of Alexander Florencio Mayorquin, William Jesus Amezcua-Flores and others. The investigation involved traditional investigative means and, in addition, included court-authorized wiretap interceptions of cellular telephones used by Alexander Mayorquin, and others. Intercepted conversations since February of 2008 which are referenced in the below information were obtained during the course of the court-authorized interceptions. Information contained within brackets [ ] from those calls are your affiant and other agents' interpretations of the meaning of terms utilized by the subjects based upon law enforcement training and experience and upon specific information gained through the course of the current investigation.

### April 18, 2008 Seizure of 14 Pounds of Methamphetamine

3. After a number of smaller drug seizures during the course of the investigation, agents became aware of a possible drug shipment by the organization. Based upon this information, on April 18, 2008, Adrian Jovan Rocha was arrested at the San Ysidro Port of Entry (POE), while attempting to enter the U.S. in a white Toyota Matrix, bearing California license plate 5RID151, which contained approximately fourteen (14) pounds of methamphetamine in a concealed compartment. Calls intercepted over the wiretap after the arrest and seizure confirmed that the drugs were seized from the organization.

### Investigative Information Passed to the Drug Trafficking Organization in May 2008

4. During the course of the investigation, in May of 2008, agents became aware of an SDPD officer, subsequently identified as Juan TAPIA, who was in contact with the subjects of this investigation. Agents suspected that the officer was supplying them with law enforcement sensitive information regarding this investigation. Below is a summary of the information obtained.

May 7, 2008

5. On May 7, 2008, during an intercepted call, A. Mayorquin told Amezcua that he needed Amezcua to talk to "Corrupto" [unknown at that time, but now identified as TAPIA]. Amezcua said that A. Mayorquin should have let Amezcua know, because Amezcua was working with "him" [Corrupto], taking apart a restaurant.[1] Amezcua said that he would work with "him" [Corrupto] again tomorrow.

May 8, 2008

6. On May 8, 2008, during an intercepted call, A. Mayorquin asked Amezcua to request that TAPIA obtain information regarding the arrest of Adrian Rocha, one of the organization's couriers who had

---

[1] On May 7, 2008, toll records indicate there were six (6) calls between TAPIA's phone and Amezcua's phone between 8:12 a.m. and 9:56 a.m.

3

been arrested on April 18, 2008, crossing the border with several pounds of methamphetamine. They also discussed that TAPIA said that A. Mayorquin should not cross into the U.S. from Mexico that night, due to a law enforcement operation. This call is detailed below.

7. At approximately 1:13 p.m., during an intercepted call, Amezcua asked A. Mayorquin "it's Rocha what?" and A. Mayorquin said "Adrian Rocha" [name of the courier who was arrested]. Amezcua responded that "Juan" [TAPIA] was going to come over, as soon as he got his patrol car.

   * Toll records for May 8, 2008 indicate that TAPIA's phone had contacted Amezcua's phone number, via the direct connect feature, at approximately 9:22 a.m.

8. At approximately 4:04 p.m., during an intercepted call, A. Mayorquin asked if Amezcua had met with "him" [TAPIA] and Amezcua said he had. Amezcua said that "he" [TAPIA] had to get the correct name, and that Amezcua had to bring him everything written down because "he" [TAPIA] had to check at the police station. A. Mayorquin repeated that the name was Adrian (Rocha). Amezcua said that he was going to write it down correctly and leave it at "his" [TAPIA's] house.

   * Toll records for May 8, 2008 show that TAPIA's phone had contact with Amezcua's phone, via the direct connect feature, at approximately 4:22 p.m.

9. At approximately 5:52 p.m., during an intercepted call, Amezcua said that "we" need the guy's date of birth. A. Mayorquin said that he would ask to see if "they" know. Amezcua said that "he" [TAPIA] said that whatever information he could get on the guy would make things better [easier to search]. Amezcua further said that "he" [TAPIA] hadn't been able to check it because he was in his patrol car, and that "he" [TAPIA] wouldn't go into the police station until "he [TAPIA] goes to drop it off. [TAPIA's patrol car is part of a pool, and TAPIA returns the car to the station at the end of his shift].

   * Toll records for May 8, 2008 indicate that TAPIA's phone contacted Amezcua's phone, via the direct connect feature, at approximately 5:52 p.m.

10. At approximately 9:14 p.m., during an intercepted call, A. Mayorquin told Amezcua Adrian Rocha's date of birth. Amezcua again confirmed the name was Adrian Rocha.

    * Toll records for May 8, 2008 indicate that TAPIA's phone, had contact with Amezcua's phone, via the direct connect feature, at approximately 9:18 p.m.

11. At approximately 9:20 p.m., during an intercepted call, Amezcua told A. Mayorquin that he (Amezcua) was just talking to "Juan" [TAPIA]. Amezcua said that "Juan" [TAPIA] told Amezcua that "he" needed to talk to A. Mayorquin over the phone, because there was a problem. Amezcua further said that "Juan" [TAPIA] said he was with a new group and that he was going to talk to A. Mayorquin and for A. Mayorquin not to cross right now. A. Mayorquin confirmed that he should stay there [Tijuana, Mexico] to which Amezcua said yes. Amezcua said that there are some problems over there and "he" (TAPIA) just said that he (A. Mayorquin) should not cross and that "he" would talk to A. Mayorquin over the phone. Amezcua said that "Juan" (TAPIA) was going to go to the warehouse and would call A. Mayorquin from Amezcua's cell phone.

    * On May 9, 2008, agents learned that SDPD Detectives, who had been assisting with this investigation, had been involved in a ICE covert operation on May 8, 2008. Agents ascertained that TAPIA, who is a patrol officer with SDPD, was assisting with the operation as part of his duties while assigned to the Border Crimes Task Force. Agents also ascertained that TAPIA knew at least two of the Detectives.

4

May 9, 2008

12.     On May 9, 2008, surveillance agents learned that Amezcua was employed at a hotel furniture reseller located in San Diego, California. Agents also learned that TAPIA's family owns that business.

13.     On May 9, 2008, interceptions over the phones, detailed below, indicated that TAPIA had looked at an organizational chart which had been prepared in support of this investigation and which had been shared with SDPD Narcotics Detectives. The chart contained names and photographs of primary subjects, including Felipe Camacho-Mayorquin, a relative of A. Mayorquin. Interceptions indicated that TAPIA relayed this information about that chart to Amezcua.

14.     At approximately 2:57 p.m. on that day, during a lengthy intercepted call, Amezcua told A. Mayorquin that he (Amezcua) had been talking to "Juan" [TAPIA].[2] Amezcua said that it wasn't Alexander's mess, or Ruben's, but that it's a guy from down south. Amezcua told A. Mayorquin that "they" [law enforcement] have "his" [the guy from down south, referring to Felipe Camacho-Mayorquin] last name and everything. Amezcua said that "they" [law enforcement] have his pictures and the ones of about seven other guys. Amezcua added that "he" [TAPIA] said that he didn't see the names well, and he couldn't be checking [TAPIA was unable to scrutinize the chart]. Amezcua further said that "he" [TAPIA] was going to get the "paper" [chart] today. A. Mayorquin asked who was the one that had that thing [chart], to which Amezcua stated that "they" [law enforcement] are working on an operation right now, and they have pictures from Nayarit of a guy. Amezcua said that he didn't remember the name that "the guy" [TAPIA] gave Amezcua, but that "he" [TAPIA] asked "Is Alex a Mayorquin?" to which Amezcua had responded yes. Amezcua stated that "he" [TAPIA] said that it [the name] sounded familiar to him. A. Mayorquin asked Amezcua if it was Felipe, to which Amezcua said "that was it, yes, Felipe Mayorquin." Amezcua said that "he" [TAPIA] was going to try to get the paper so that A. Mayorquin could see all of the pictures. Amezcua further said that A. Mayorquin didn't have a problem [with law enforcement], that he should cross over so they could talk and look at the pictures to see if it was one of A. Mayorquin's uncles. Amezcua told A. Mayorquin that "he" [TAPIA] said that he was with a group of detectives that were friends of his and that they were talking, and "he" asked what was up with the deal at the border. Amezcua said that "he" was told by them [detectives] that they have a lot of jobs and this is the big job that they gave us right now.

    *       Agents subsequently learned that an SDPD detective had provided some information about this investigation to TAPIA, specifically that they were conducting surveillance of their targets in San Diego and that some arrests had been made. Agents believe that TAPIA did not understand that the operational activity in which he was participating on May 8th and May 9th was part of a separate ICE investigation, and that instead, TAPIA confused that ICE operation with this investigation.

15.     Amezcua stated that "he" [TAPIA] said that he was going to try to get the "paper" [chart] that afternoon, so that he could see all of the names. Amezcua further stated that "he" said that "they" [detectives] are all his friends but that he [TAPIA] couldn't just say "give it to me because I know one of those guys." Amezcua said that "he" [TAPIA] said that he would have to pretend that he was playing and say "Let me see that thing" [chart]. Amezcua also said that if "he" couldn't do it [get the chart] then he would memorize the names and give them to Amezcua. Amezcua then told A. Mayorquin that "he" [TAPIA] said that he would have "this guy's" thing [Adrian Rocha's arrest information] at about 8:00.

---

[2]  Toll records for May 9, 2008 indicate that TAPIA's phone contacted Amezcua's phone at approximately 12:05 p.m.

Amezcua concluded by saying that "he" [TAPIA] said that he was going to keep adding up the beers, and that A. Mayorquin owed him a night out drinking.

> \*   A review of records revealed that TAPIA's user account was utilized to run an FBI/NCIC records check in CLETS of the name Adrian Rocha and with his date of birth on May 9, 2008, at approximately 8:18 p.m.
>
> \*   Toll records for May 9, 2008 indicate that TAPIA's phone, had contact with Amezcua's phone, at approximately 8:21 p.m.

16.   At approximately 9:07 p.m., during an intercepted call, Amezcua told A. Mayorquin that "he" [TAPIA] had said that was the only Mayorquin [that appeared on the chart]. Amezcua also said that about Rocha, that it didn't show him as being detained, but that "he" [TAPIA] was going to check somewhere else, with the "Feds." Amezcua said that "he" [TAPIA] said that the only thing that came up was that he (Rocha) had a suspended license. Amezcua provided additional information about the chart, in that there was a photograph of Felipe Camacho-Mayorquin on the chart and that "they" [law enforcement] had all his connections. Amezcua said that there was something about a guy from that side [U.S.] who they are only surveilling, and that the guy was connected with A. Mayorquin's relative. Amezcua said that "he" [TAPIA] wanted Amezcua to tell A. Mayorquin to be on the lookout and that there would be a "checkpoint" [possibly law enforcement activity at the border] all week long. Amezcua said that if A. Mayorquin stopped by Amezcua's house that Amezcua could show A. Mayorquin "Juan's message" [text message or email sent by TAPIA].

### July 9, 2008 False Statement Made By TAPIA

### July 2, 2008

17.   On July 2, 2008, DEA Special Agent Jeff Neves contacted TAPIA by telephone in order to ask him why he had run the name of Adrian Rocha through the law enforcement databases. He asked why TAPIA had run the name, saying that he hoped TAPIA potentially had an informant who could assist Neves. TAPIA said that it must have been related to an operation that he had been involved in earlier, but when S.A. Neves mentioned that it couldn't have been that operation as TAPIA had run the name weeks earlier, TAPIA said that he couldn't remember but would look in to it and get back with S.A. Neves. S.A. Neves thanked him and said that he would call him later.

### July 9, 2008

18.   TAPIA did not get back to S.A. Neves so S.A. Neves called TAPIA again and left a message on July 9, 2008, inquiring about the previous conversation. TAPIA and S.A. Neves spoke later that day by phone and in that call TAPIA told S.A. Neves that he had run Rocha's name in relation to an auto theft investigation. TAPIA stated, "I remember looking back at some of the notes, and the guy... I... I remember I'd looked to 'im for some auto theft stuff, that we were having some problems down on... uh... Camiones, and they... somebody threw that name out to me." TAPIA gave details about the investigation, including stating that Rocha was believed to be involved with "Gonzalez," and that they were stealing cars from 5757 Camiones Way, near the border.

### Arrest of A. Mayorquin and Amezcua and Interview of TAPIA on July 11, 2008

19.   On July 10, 2008, A. Mayorquin was arrested along with two other targets of the investigation, after the three met for a money exchange that morning. After the arrest Amezcua found out about it and tried to get in touch with TAPIA by calling him on several occasions on Friday, July 11. When

6

he got in touch with him, Amezcua told TAPIA that he had something to talk to him about and that he needed to meet with him. TAPIA responded that they could meet after Amezcua crossed the border.

20.  After this intercepted call, agents arranged to have Amezcua's vehicle referred to secondary inspection. When Amezcua entered the United States, he was sent to secondary inspection and the agents spoke with him. After being read his Miranda rights, he was questioned about his relationship with A. Mayorquin and the police officer named Corrupto. While Amezcua admitted that he knew both individuals and admitted to asking Corrupto to do a records check on an individual, he said that it was because he and A. Mayorquin had thought that Adrian Rocha had stolen a car. However, when questioned about this story, he could not say what type of car was allegedly stolen or from where it was stolen. Amezcua was arrested at about 5:00 p.m., but his girlfriend, who was traveling with him at the time, was released.

21.  The agents then wanted to question TAPIA as soon as possible. He was working a shift that night and so SA Catherine Klawiter contacted him and asked if they could speak to him up at the FBI office TAPIA arrived at the FBI main office at approximately 10:00 pm, and was interviewed by three agents, S.A. Klawiter and S.A. Natalie Lambert from the FBI and S.A. James Sparks from DEA. The interview started with TAPIA denying that he had ever run Rocha's name for anyone. TAPIA went into detail with a story about why he ran the name, stating that it was regarding an auto theft investigation and giving details about the investigation. As previously recorded calls were played for him he continued to deny it, and also denied that he ever passed any information on anyone. However, after a period of time he admitted that he had run the name at the request of Amezcua and A. Mayorquin. He said that they asked him to find out if Rocha had been arrested. He also said that while he did not know initially that A. Mayorquin was a drug dealer, once he saw the chart with Felipe Mayorquin's name on it he realized that he probably was involved.

### Follow-up interview of TAPIA on July 15, 2008

22.  TAPIA was re-interviewed by the agents on July 15, 2008. During the interview he once again admitted that he had run the Rocha name for Amezcua and A. Mayorquin, and admitted discussing the chart and the accompanying investigation with Amezcua. However, TAPIA denied ever having A. Mayorquin warned against crossing the border, and also denied getting together with Amezcua to arrange a cover story on why he ran the name. He also stated that the information passed to Amezcua had been done in casual conversation and was not intended as a warning.

Based upon the above related information, I believe that Juan Hurtado TAPIA is involved in the charged offenses.

*Natalie Lambert*  8/28/08
Natalie Lambert
Special Agent, FBI

# MAGISTRATE JUDGE INFORMATION SHEET

**MAGISTRATE CASE NUMBER:**

1. Hearing Date _____  2. AUSA Joseph S. Smith  3. Mag Judge William McCurine
4. USAO # _____  5. Agency # FBI
6. Defendant #: 1 of $  7. Case Agent Cathy Klawiter/Natalie Lambert, S/A, FBI
8. Charges: 18 USC 1512(c)(2); 18 USC 1030(a)(2); 18 USC 1001
9. Defendant's Name: Juan Hurtado Tapia  10. Social Security #: 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
11. Alias: _____  12. Birth Date: 9/5/1969
13. Address: 1055 7th St, Imperial Beach, CA
14. Arrest Date: _____  15. Place of Arrest: _____  16. Date Committed: _____
17. Agent(s): Cathy Klawiter/Natalie Lambert  18. Office Phone #: 858-565-1255
19. Agency: FBI  20. Station: _____
21. Custody: Yes X  No ___
22. Citizenship: U.S. ✓  Mex ___  Other ___
23. INS Status: Res ___  BCC ___  Illegal ___  Other A#
24. Prior Deports: none  25. IDENT Hits: _____
26. Prior Record: none
27. Drug Usage: none  How Evidenced? _____
28. Cash on Defendant: _____  29. Other Evidence: _____
30. Agents Fact Summary:
_____
_____
_____
_____
_____

31. Agent's info re: Defendant (Employment, Family, etc.) _____
32. Def Attorney: Appointed ___  Retained ___
33. DEFENSE ATTORNEY: _____  PHONE NUMBER: _____
34. Next Date for: PH Removal  Date ___  Time ___  Detention  Date ___  Time ___
35. Bond Set: _____
36. Material Witness Custodial Status:  Custody ___  Not in Custody ___
37. MATERIAL WITNESS ATTORNEY: _____  PHONE NUMBER: _____

Government's Notes for Bail
_____

**Court's Orders/Motions**

MJ Info Sheet (lb)
11/5/04

**MAGISTRATE JUDGE INFORMATION SHEET**

**CONTINUATION RE:**

**IMMIGRATION HISTORY:**

**CRIMINAL HISTORY:**